## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA

|  |  |
|---|---|
| ASTRAZENECA PHARMACEUTICALS LP, *Plaintiff*, <br><br> v. <br><br> DREW H. WRIGLEY, in his official capacity as the Attorney General of North Dakota; <br><br> *and* <br><br> Carolyn Bodell, Tanya L. Schmidt, Tyler G. Lannoye, Shane R. Wendel, Kevin J. Oberlander, Diane Halvorson, and Ron Horner, in their official capacities as Members of the North Dakota Board of Pharmacy; and MARK J. HARDY, in his official capacity as Executive Director of the North Dakota Board of Pharmacy, <br><br> *Defendants.* | **No: 1:25-cv-00182-DMT-CRH** <br><br> **ORAL ARGUMENT REQUESTED** |

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' <u>MOTION FOR JUDGMENT ON THE PLEADINGS</u>

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................ 4

        A.       The Federal 340B Program .............................................................................4

        B.       Contract Pharmacy Use Leads to Abuse and Profiteering .......................................5

        C.       AstraZeneca's 340B Policy and Resulting Litigation ............................................9

        D.       Arkansas' Act 1103, the *PhRMA* Litigation, and Its Aftermath ...........................10

        E.       North Dakota Enacts HB 1473 and AstraZeneca Challenges the Law ...................12

STANDARD OF REVIEW ................................................................................................ 14

ARGUMENT .................................................................................................................... 14

I.       HB 1473 Is Preempted ........................................................................................15

        A.      Federal Patent Law Preempts HB 1473 ...................................................15

        B.      Section 340B Preempts HB 1473's Data-Collection Provision ...........................27

II.      HB 1473 Violates the Contracts Clause .........................................................30

III.     HB 1473 Violates the Takings Clause .............................................................36

CONCLUSION .................................................................................................................. 40

**INTRODUCTION**

Section 340B of the federal Public Health Service Act, 42 U.S.C. § 256b, requires participating pharmaceutical manufacturers to "offer" their products at steeply discounted rates to a clearly defined list of providers known as "covered entities." Access to these 340B discounts is costly to manufacturers, and Congress carefully limited the circumstances in which they must be made available. Plaintiff AstraZeneca Pharmaceuticals LP successfully sued the federal government to establish that Section 340B does *not* require offering discounts for drug sales at unlimited commercial pharmacies that contract with covered entities—known as "contract pharmacy sales." Federal courts have agreed that a manufacturer's obligation to "offer" discounts under the 340B program *does not* "require[] drug makers" to offer 340B discounts for sales at "an unlimited number of contract pharmacies." *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 461 (D.C. Cir. 2024); *accord Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696, 706 (3d Cir. 2023).

Dissatisfied with the scope of *federal* law, North Dakota has enacted a statute, known as HB 1473, that imposes on participants in the federal 340B program precisely the same obligation as a matter of *state* law. HB 1473 requires participating manufacturers to offer their drugs at 340B-discounted prices for unlimited contract pharmacy sales. It also forbids manufacturers from collecting data about 340B sales. HB 1473 is unconstitutional on at least four separate grounds.

***First***, as applied to AstraZeneca's patented products, HB 1473 directly conflicts with, and thus is preempted by, federal patent law. In *Biotechnology Industry Organization (BIO) v. District of Columbia*, the Federal Circuit squarely held that federal patent law "prohibits states from regulating the price of patented goods." 496 F.3d 1362, 1372 (Fed. Cir. 2007). Yet HB 1473 does precisely that, by requiring AstraZeneca to offer its patented drugs for sale at 340B-discounted prices for unlimited contract pharmacy sales. North Dakota's law thus extends federal price controls to a category of patented drug sales (contract pharmacy sales) for which federal courts have held that

price controls do *not* otherwise apply. And even beyond its effect on pricing, HB 1473 has an indisputable financial effect on AstraZeneca's sales of its patented drugs, upending Congress's considered judgment regarding the "pecuniary rewards stemming from the patent right." *Id.*

*Second*, HB 1473's data-collection provision is preempted by Section 340B. AstraZeneca needs access to claims data, which covered entities collect in the regular course of their business, in order to facilitate the federal audit process under Section 340B and to avoid unlawful duplicate discounts. Because HB 1473 directly cuts off access to that necessary data—which AstraZeneca has no other means to obtain—it is preempted by Section 340B.

*Third*, HB 1473 violates the Contracts Clause of the U.S. Constitution. Under that Clause, North Dakota may not "substantially impair" a pre-existing contractual relationship unless that impairment is reasonably tailored to a "a significant and legitimate public purpose." *Ass'n of Equip. Mfrs. v. Burgum*, 932 F.3d 727, 730-31 (8th Cir. 2019). In agreeing to participate in the 340B program, AstraZeneca signed a contract with the federal government that did *not* obligate AstraZeneca to offer discounts for unlimited contract pharmacy sales. HB 1473 significantly expands AstraZeneca's obligations under that contract to include offering 340B discounts for unlimited contract pharmacy sales—thereby imposing millions of dollars of additional costs on AstraZeneca. The Contracts Clause categorically "prohibits" these sorts of "special-interest redistributive laws," which undermine the contractual rights of a disfavored group (here, manufacturers) in order to favor a "specific class" of beneficiaries (covered entities and contract pharmacies). *Id.* at 732. Regardless, HB 1473 does *not* require discounts to be passed on to patients in the form of lower drug prices, and the discovery record will confirm that usually they are not, but instead are retained as windfall profits by some of the largest private corporations in the country.

*Fourth*, HB 1473 works an unconstitutional taking of private property, in violation of the

2

Takings Clause of the U.S. Constitution. Under the Takings Clause, "the sovereign may not take the property of *A* for the sole purpose of transferring it to another private party *B*," a prohibition that applies regardless of whether "*A* is paid just compensation." *Kelo v. City of New London*, 545 U.S. 469, 477 (2005). But HB 1473 requires manufacturers like AstraZeneca to transfer title to and possession of their property (prescription drugs) to other private parties (covered entities and the pharmacies with which they contract). This forced transfer would be unlawful even if manufacturers were paid just compensation for these contract pharmacy sales. But in fact they are not: Manufacturers are compensated only at steeply discounted prices, well below fair market value. Indeed, enabling covered entities to obtain manufacturers' products at below-market prices is the whole reason that HB 1473 was enacted.

Defendants have moved for judgment on the pleadings, arguing that HB 1473 should be upheld as a matter of law. But their arguments ignore controlling case law and AstraZeneca's well-pled allegations. Indeed, another court in this Circuit recently *denied* a motion for judgment on the pleadings involving similar claims against a similar state law because, "taking AstraZeneca's allegations as true," AstraZeneca had established a "right to relief." Order at 12, *AstraZeneca Pharms. LP v. Harris*, No. 4:24-cv-268 (E.D. Ark. Sept. 30, 2025), ECF No. 141 ("*Harris* Order"). As in *Harris*, AstraZeneca's allegations here, if taken as true, establish a right to relief.

Notably, the discovery in *Harris* has *already* provided strong evidence supporting AstraZeneca's allegations: about how the 340B program operates; about how state laws that ostensibly require "delivery" of 340B drugs actually regulate drug *pricing* instead; about how such laws harm manufacturers like AstraZeneca, burden their federal rights, and impair their agreements with the federal government; and about how such laws force manufacturers to relinquish custody, possession, and title to their drugs at below-market rates. Discovery here, which

3

is already underway, will show the same things. Defendants' motion should be denied. Pursuant to Local Rule 7.1(A)(6), AstraZeneca respectfully requests oral argument on Defendants' motion.

## BACKGROUND

### A.  The Federal 340B Program

Section 340B of the Public Health Service Act established a federal program that "imposes ceilings on prices drug manufacturers may charge for medications sold to specified health-care facilities," known as covered entities, that provide healthcare to certain underserved populations. *Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 113 (2011). Congress enacted Section 340B to give covered entities access to prescription drugs at below-market prices, thereby helping them serve their uninsured and indigent patients. H.R. Rep. No. 102-384, pt. 2, at 7 (1992). As a condition of receiving coverage and reimbursement for its drugs under Medicaid and Medicare Part B, a pharmaceutical manufacturer must enter into a pharmaceutical pricing agreement (PPA) with HHS. 42 U.S.C. § 256b(a)(1). In its PPA, a manufacturer must "offer each covered entity covered outpatient drugs for purchase" at a specified discount price "if such drug is made available to any other purchaser at any price." *Id.* This is known as Section 340B's "must-offer" requirement.

A manufacturer that "knowingly and intentionally" charges more than the 340B discount price is subject to civil monetary penalties. *Id.* § 256b(d)(1)(B)(vi)(III). The 340B statute also regulates covered entities, which may not obtain 340B pricing on units of drugs for which a manufacturer pays a Medicaid rebate (a practice known as "duplicate discounts"), nor may they resell or otherwise transfer such drugs to persons other than their patients (a practice known as "diversion"). *Id.* § 256b(a)(5)(A), (B). Congress has added to the list of 340B-covered entities over time, and today there are fifteen categories. *Id.* § 256b(a)(4)(A)-(O).

The 340B program has its own enforcement provisions and administrative dispute-resolution process. Congress required HHS to establish an adjudicatory body to resolve disputes

4

among 340B participants, including "claims by covered entities that they have been overcharged for drugs purchased under this section [340B], and claims by manufacturers ... of violations" by covered entities. *Id.* § 256b(d)(3)(A). Under that statutory mandate, the Health Resources and Services Administration (HRSA), the subagency of HHS that oversees the 340B program, created the 340B Program's administrative dispute resolution (ADR) process. 85 Fed. Reg. 80,632, 80,632 (Dec. 14, 2020). The ADR Rule authorizes panels of federal officers to resolve claims for monetary damages, as well as other equitable relief sought by claimants. *See* 42 C.F.R. § 10.21(a); 89 Fed. Reg. 28643, 28,644 (2024). And it empowers ADR panels to address a range of factual and legal disputes, including "those having to do with covered entity eligibility, patient eligibility, or manufacturer restrictions on 340B sales." 85 Fed. Reg. at 80,636; *accord* 89 Fed. Reg. at 28649 (ADR process appropriate for claims "of overcharges, diversion, and duplicate discount[s]").

Importantly, before a manufacturer may access the ADR process, HRSA requires the manufacturer to first audit a covered entity. *See* 42 U.S.C. § 256b(d)(3)(B)(iv); 42 C.F.R. § 10.21(a)(2). And under HRSA regulations, a manufacturer may only initiate an audit when it can point in advance to "documentation which indicates that there is reasonable cause," with "reasonable cause" defined to mean "that a reasonable person could believe that a covered entity may have violated" the prohibitions on diversion or duplicate discounting. 61 Fed. Reg. 65,406, 65,409 (Dec. 12, 1996). Thus, absent such "documentation," the ADR process is unavailable to a manufacturer. *Id.*; *see* Am. Compl. ¶ 25.

### B.  Contract Pharmacy Use Leads to Abuse and Profiteering

Congress intended for covered entities to continue passing on the below-market prices required by Section 340B, commonly referred to as "340B prices," to the "low-income and rural" patients for whom they often care. *Sanofi*, 58 F.4th at 699 . That is the way the program worked originally. Am. Compl. ¶ 27. But over time, covered entities realized that if they *did not* pass on

5

the full 340B discount, they could use the program to generate arbitrage "revenue." *Sanofi*, 58 F.4th at 699. As the Third Circuit has explained, "they turn a profit when insurance companies reimburse them at full price for drugs that they bought at the 340B discount." *Id.*; *see Novartis*, 102 F.4th at 457 (covered entities use the program to generate a "spread between the discounted price and the higher insurance reimbursement rate").

Indeed, covered entities now often view this revenue generation—rather than providing discounts to patients—as the primary purpose of the 340B program. Am. Compl. ¶¶ 32, 38, 40, 42. They refer to this arbitrage income as "340B savings" or "340B revenue," which they can use for *any* purpose (however unrelated to the 340B program). *Id.* ¶ 34; *see id.* ¶¶ 38, 40, 42. The pursuit of these arbitrage profits, and new schemes for generating them in ever-increasing amounts, have transformed the 340B program into something that would be unrecognizable to the Congress that enacted it. *Id.* ¶¶ 32-42.

***Contract Pharmacies***. At the time of Section 340B's enactment, manufacturers provided discounted drugs directly to covered entities, who in turn provided them to their patients for free or at cost. *Id.* ¶ 27. Contract pharmacies were not mentioned by Congress, nor were they used by covered entities when the program was first created. *Id.* ¶¶ 27-28. Over subsequent years, however, HRSA issued non-binding "guidance" purporting to authorize covered entities to enter into agreements with contract pharmacies to dispense 340B-discounted drugs. *Id.* ¶ 28-30.

In 1996, HRSA issued guidance under which "eligible covered entities that do not have access to appropriate 'in-house' pharmacy services" could enter into an agreement with a *single* outside pharmacy of their choice ("only one site") to provide such services for 340B-priced drugs. 61 Fed. Reg. 43,549, 43,555 (Aug. 23, 1996) (1996 Guidance). Even after that guidance, however, contract pharmacy use was rare: By 2000, only 47 covered entities (out of more than 11,500) had

6

registered contract pharmacies with HRSA. Am. Compl. ¶ 29. In 2010, however, HRSA released new guidance permitting covered entities to "use multiple pharmacy arrangements"—that is, an *unlimited* number of contract pharmacies. 75 Fed. Reg. 10,272, 10,273 (Mar. 5, 2010) (2010 Guidance). The 2010 Guidance thus purported to authorize a covered entity to enter into an unlimited number of contract pharmacy arrangements anywhere in the United States.

The 2010 Guidance led to an explosion in contract pharmacies distributing 340B-priced drugs, enabling major national pharmacy chains like CVS, Walgreens, and Walmart to reap outsized profit margins by reselling these discounted drugs at full price to insured patients. Am. Compl. ¶ 31. The number of contract pharmacies correspondingly ballooned—from approximately 1,300 in 2010, to more than 33,000 today. *Id.* These contract pharmacies now hold more than 194,000 individual contracts with covered entities, which collectively produce billions of dollars in additional annual revenue for contract pharmacies. *Id.* ¶¶ 31, 37.

***The Replenishment Model***. Over time, the desire to generate ever-greater revenue from the 340B program has led covered entities, and the for-profit pharmacies with which they contract, to adopt aggressive accounting practices designed to recharacterize as many sales as possible as eligible for 340B discounts. *Id.* ¶ 32. These practices are increasingly divorced from the 340B program's origins, from ordinary business practices, and from any semblance of what Congress intended when it enacted the program. *Id.* ¶¶ 38-42.

In recent years, most covered entities and their contract pharmacies have embraced a so-called "replenishment model." *Id.* ¶¶ 33, 44-48. Under this model, contract pharmacies do not "maintain separate inventories of section 340B drugs." *Id.* ¶ 32 (quoting *Novartis*, 102 F.4th at 457-58). Instead, they maintain a single, common inventory for *all* drugs, and they keep track of 340B-purchased drugs through an accounting process that is commonly described as "virtual"

7

(*i.e.*, not corresponding to physical reality). *Id.*; *see also id.* ¶ 80. When pharmacies receive 340B-purchased drugs, they physically store them in a "neutral inventory," alongside drugs purchased at commercial prices, where *all* the drugs are mixed together. *Id.* Since 340B drugs do not differ from non-340B drugs in any respect other than price, there is no telling them apart. *Id.* at ¶ 53.

With the replenishment model, patient eligibility is not checked at the point of sale. Instead, contract pharmacies dispense drugs from their neutral inventory, with no regard for the patient's 340B "eligib[ility]." *Id.* ¶ 32 (quoting *Novartis*, 102 F.4th at 457-58). In other words, the pharmacy will dispense drugs to *any* patient, whether 340B-eligible or not. *Id.* Then, at some point after the patient has left the pharmacy—days, weeks, or sometimes even months later—a third-party administrator combs the pharmacy's prior sales data for 340B-eligible sales. *Id.* Once it has identified enough 340B-eligible sales to notionally deplete a contract pharmacy's virtual inventory, it places an order on behalf of the covered entity, thereby supposedly "replenish[ing]" the drug that has already been dispensed with another 340B-priced drug. *Id.* That order is then shipped directly to the contract pharmacy, which takes title at the time that it takes delivery of the drugs. *Id.* ¶¶ 44-45. The replenishment drugs—purchased at 340B prices but indistinguishable from other drugs—are put into the pharmacy's neutral inventory, and the cycle begins again.

In addition to replenishing 340B sales as just described, a growing number of contract pharmacies now employ an approach that is even more brazen about using the 340B program to generate arbitrage revenue: so-called "credit replenishment." *Id.* at ¶ 36. Under this approach, the contract pharmacy's inventory is "virtually replenished" through a paper fiction—namely, by recharacterizing the prior transaction to make it appear as if the previously dispensed unit had been bought at the 340B price originally. *Id.* To do so, the wholesaler credits the pharmacy for the commercial price; charges the 340B price to the covered entity; and then requests a refund from

8

the manufacturer for the difference between the wholesale and 340B prices. *Id.* This is a purely financial maneuver: No new product is purchased, nor is any product distributed as a result. *Id.*

The replenishment system is designed to generate—and does generate—significant revenues. *Id.* ¶¶ 32, 34, 37. As evidenced by the fact that contract pharmacies do not check 340B eligibility until after the drug has been dispensed to a patient, they are charging patients and their insurers full commercial prices up front. *Id.* ¶¶ 32-33, 36. Yet covered entities are *not* paying commercial prices for those same drugs; they are paying 340B prices, which are set by a statutory formula. *See* 42 U.S.C. § 256b(a)(1)-(2); Am. Compl. ¶¶ 32, 34, 36. That difference in price can be hundreds, or even thousands, of dollars per prescription. For example, a prescription for 90 tablets of AstraZeneca's patented product Farxiga retails for "hundreds of dollars" commercially, but can be purchased for "less than a dollar" with a 340B discount. Am. Compl. ¶ 51. Thus, the 340B program can require a manufacturer to offer its drugs at a discount of up to 99% off the retail price—sometimes for as low as a penny. *See* 42 C.F.R. § 10.10(b).

These discounts are usually *not* being passed on to patients. Am. Compl. ¶ 38, 40. Nor are 340B profits primarily used to service federally qualified health centers or other federal grantees that provide services to underserved populations, medically underserved areas in general, or uninsured patients. *Id.* ¶¶ 38-39, 41. They are instead lining the pockets of 340B hospitals, as well as large, for-profit contract pharmacies and third party administrators—who together take roughly 20%-30% of the revenue generated by 340B sales. *Id.* ¶¶ 32, 37-38.

### C.  AstraZeneca's 340B Policy and Resulting Litigation

To combat abuse of the 340B program, AstraZeneca announced in August 2020 that, effective October 1, it would return to the approach set forth in HRSA's 1996 Guidance. *Id.* ¶ 54. AstraZeneca would continue to offer unlimited 340B discounts to covered entities. *Id.* ¶ 55. For each covered entity that lacked its own in-house pharmacy, AstraZeneca would also offer 340B

discounts for sales at a single designated contract pharmacy. *Id.* But AstraZeneca would no longer offer discounts for sales at unlimited contract pharmacies. *Id.*

In response to AstraZeneca's contract pharmacy policy and similar policies adopted by other manufacturers, HHS issued an Advisory Opinion asserting that the 340B statute requires manufacturers to make 340B discounts available for unlimited contract pharmacy sales. *Sanofi*, 58 F.4th at 701. AstraZeneca successfully challenged that Advisory Opinion—and a related "violation letter" sent by HRSA—in district court. *Id.* at 702. On appeal, several States submitted an amicus brief supporting the federal government, arguing that manufacturers have a "statutory obligation to offer safety-net providers 340B-discounted prices on critical prescription drugs" via unlimited contract pharmacy sales, which "allow[] covered entities to generate significant revenue." Br. of Amici Curiae States at 2, 4, *Sanofi Aventis U.S., LLC v. HHS*, Nos. 21-3167, 21-3168, 21-3379 & 21-3380 (3d Cir. May 16, 2022).

The Third Circuit held the Advisory Opinion and violation letter "unlawful," and it "enjoin[ed] HHS from enforcing against [AstraZeneca] its reading of Section 340B." *Sanofi*, 58 F.4th at 706. It also held that AstraZeneca's contract pharmacy policy "do[es] not violate Section 340B." *Id.* The D.C. Circuit later joined in "reject[ing] [the] position that section 340B prohibits drug manufacturers from imposing any conditions" on their "offer" of 340B discounts for contract pharmacy sales. *Novartis*, 102 F.4th at 459. The D.C. Circuit also specifically upheld manufacturer policies requiring covered entities to provide claims data associated with 340B contract pharmacy orders, which allows manufacturers to prevent the improper diversion of their 340B-discounted medicines, while imposing only "minimal" burdens on covered entities. *Id.* at 463-64.

### D. Arkansas' Act 1103, the *PhRMA* Litigation, and Its Aftermath

In response to this federal litigation, several States enacted 340B litigation, including Arkansas's Act 1103. PhRMA (a trade organization representing certain drug manufacturers)

10

challenged Act 1003's constitutionality, arguing that it was facially preempted by Section 340B and invalid under the dormant Commerce Clause. Am. Compl. ¶ 77 (citing *PhRMA v. McClain*, 645 F. Supp. 3d 890, 893-94 (E.D. Ark. 2022)). No party took discovery. *See id.* ¶ 78. The Eighth Circuit upheld the law. *PhRMA v. McClain*, 95 F.4th 1136 (8th Cir. 2024). Central to its ruling were two factual assumptions regarding the relationship between covered entities and contract pharmacies: first, that "[c]overed entities maintain legal title to the 340B drugs" when they are acquired by contract pharmacies; and second, that a contract pharmacy acts as "an agent of the covered entity" with respect to the sale of 340B drugs. *Id.* at 1142. Those factual assumptions were foundational to the court's conclusion that, under Act 1103, contract "[p]harmacies do not purchase 340B drugs, and they do not receive the 340B price discounts." *Id.* at 1144. In addition, in concluding that Act 1103 "creates no obstacle" to the 340B program, the Eighth Circuit relied on its understanding that the Act "simply deter[s] pharmaceutical manufacturers from interfering with a covered entity's contract pharmacy arrangements." *Id.* at 1145. Those factual assumptions are incorrect. Am. Compl. ¶¶ 80-81. And because PhRMA's facial challenge involved no record, the Eighth Circuit had no evidence before it regarding those points (or any others).

AstraZeneca has also challenged Act 1103, but on an as-applied basis. AstraZeneca raised claims different from those in the *PhRMA* suit: that Act 1103 was preempted by federal patent law and that it violates the Contracts and Takings Clauses. Am. Compl., *AstraZeneca v. Harris*, No. 4:24-cv-268 (E.D. Ark. July 12, 2024), ECF No. 25. A covered-entity intervenor moved for judgment on the pleadings, asserting that "AstraZeneca's arguments fail" because "this [district] court has decided that, as a matter of law, Act 1103 regulates delivery and that decision was affirmed by the Eighth Circuit," such that "[n]o amount of discovery can rescue AstraZeneca." Reply Br. at 1, 10, *AstraZeneca v. Harris*, 4:24-cv-268 (E.D. Ark. Apr. 1, 2025), ECF No. 102.

11

The district court denied that motion. It acknowledged that its prior holding on Act 1103, and the Eight Circuit's affirmance, were "based solely on the statutory text of Act 1103," and that "facts were not developed or litigated in that case," and so "were not before the Court," including facts related to such issues as "title," agen[cy]," and "the enforcement of Act 1103." *Harris* Order at 12. "[T]aking AstraZeneca's allegations as true," on those facts and others, the court held that AstraZeneca had "raised a right to relief above a speculative level" on each of its claims. *Id.*; *see id.* at 15, 17, 18. The case has now proceeded through discovery to summary judgment.

### E.  North Dakota Enacts HB 1473 and AstraZeneca Challenges the Law

In April 2025, North Dakota enacted HB 1473, which imposes five prohibitions: *First*, a pharmaceutical manufacturer must not "[d]irectly or indirectly deny, restrict, prohibit, or otherwise interfere with the acquisition of a drug by a contract pharmacy on behalf of a covered entity unless receipt of the drug is prohibited by federal law." HB 1473 § 1(b)(1). *Second*, a manufacturer must not "[p]rohibit a contract pharmacy from dispensing a drug by denying access to the drug." *Id.* § 1(b)(2). *Third*, a manufacturer must not "[r]equire a covered entity or contract pharmacy to submit any claims, encounter, or utilization data as a condition for acquiring or receiving a drug, unless the claims, encounter, or utilization data sharing is required by federal law." *Id.* § 1(b)(3). *Fourth*, a manufacturer must not "[i]nterfere with the ability of a covered entity or contract pharmacy to dispense a drug to an eligible patient of the covered entity." *Id.* § 1(b)(4). *Fifth*, a manufacturer must not "[o]ffer or otherwise make available a drug in the form of a rebate, unless in the form of a discount at the time of sale and authorized under federal law." *Id.* § 1(b)(5).

The unmistakable operation and apparent intent of HB 1473 is to compel pharmaceutical manufacturers to make 340B discounts available for unlimited contract pharmacy sales. The law defines all of its basic terms by reference to federal law. It defines: a "[c]ontract pharmacy" as "a pharmacy that has a contract with a covered entity to receive and dispense drugs to the covered

entity's patients on its behalf," *id.* § 1(a)(1); a "[c]overed entity" as "an entity participating or authorized to participate in a federal drug discount program under 42 U.S.C. 256b," *i.e.*, the 340B statute, *id.* § 1(a)(2); and a "[d]rug" as "a drug purchased under reduced pricing under section 340B of the federal Public Health Service Act by a covered entity." *Id.* § 1(a)(3).

Violations of HB 1473 are *crimes*: Class B misdemeanors punishable by a $1,500 fine, as well as up to 30 days of imprisonment. HB 1473 § 1(b); N.D. Cent. Code § 12.1-32-01(6). The Attorney General also has general authority to enforce North Dakota law. N.D. Cent. Code §§ 54-12-01(2); 54-12-02. HB 1473 empowers the State Board of Pharmacy to impose civil penalties of up to $10,000 per violation as well. HB 1473 § 1(b); N.D. Cent. Code § 43-15.3-09(1)(b).

AstraZeneca sued North Dakota's Attorney General and the members of its Board of Pharmacy, seeking declaratory and injunctive relief. Compl., *AstraZeneca v. Wrigley*, No. 1:25-cv-182 (D.N.D. Aug. 1, 2025), ECF No. 1. It alleges that HB 1473 is preempted by federal patent law, Section 340B, the Contracts Clause, and the Takings Clause. Am. Compl., ECF No. 11. AstraZeneca explained that a "factual record" will confirm HB 1473's unconstitutional operation and impacts. *Id.* ¶ 79; *see, e.g.*, *id.* ¶¶ 78-81, 94, 100-01, 103-04, 113-14, 123.

In the short life of this case, Defendants have already tried to avoid discovery *twice*. Before filing the instant motion, they argued that this Court should "postpon[e] discovery" because—in their view—AstraZeneca's "constitutional arguments can be resolved" on the law. Scheduling Order at 4-5, ECF No. 23. AstraZeneca explained its contrary view that "[d]iscovery is necessary to address several key issues in this case," such that "[c]onducting discovery while the motion for judgment on the pleadings is pending would help resolve this case expeditiously and without delay." *Id.* at 2-3. The Court rejected Defendants' argument, ruling that "the court shall not stay discovery pending disposition of the anticipated motion for judgment on the pleadings." *Id.* at 12.

13

Defendants now move for judgment on the pleadings, yet again arguing (at 38) that "nothing that AstraZeneca claims it will obtain through discovery is likely to affect the constitutionality (or unconstitutionality) of the challenged State statute." According to Defendants (at 2), the "logic" of the facial ruling in *PhRMA* "forecloses every claim that AstraZeneca pursues here."

### STANDARD OF REVIEW

"Judgment on the pleadings should be granted only if the moving party has clearly demonstrated that no material issue of fact remains and the moving party is entitled to judgment as a matter of law." *Partridge v. City of Benton*, 929 F.3d 562, 564-65 (8th Cir. 2019) (citation omitted). The Court must "view all facts pleaded by [AstraZeneca] as true and grant [it] all reasonable inferences." *Levitt v. Merck & Co., Inc.*, 914 F.3d 1169, 1171 (8th Cir. 2019) (cleaned up). The court must deny the motion whenever "[t]he facts alleged in the complain [are] enough to raise a right to relief above the speculative level." *Mickelson v. Cnty. of Ramsey*, 823 F.3d 918, 923 (8th Cir. 2016) (citation omitted).

### ARGUMENT

Defendants' motion for judgment on the pleadings fails to account for AstraZeneca's well-pled factual allegations. AstraZeneca offers detailed allegations regarding how HB 1473: directly affects pricing, far beyond merely addressing "delivery" or "distribution," Am. Compl. ¶¶ 7, 53-60, 80-81, 86, 88, 94-95, 114, 123; imposes a severe and unmistakable financial burden on AstraZeneca, *id.* ¶¶ 51, 95; upends the expectations that AstraZeneca had when it signed its PPA with the Secretary of HHS, *id.* ¶ 114; and forces AstraZeneca to relinquish custody, possession, and title to its drugs at below-market rates, *id.* ¶¶ 80, 123. Defendants' motion effectively ignores all of those allegations.

Instead, Defendants base their motion primarily on the Eighth Circuit's *PhRMA* decision. But *none* of the legal claims here overlap with the claims at issue there. Moreover, as another court in this District has explained, the type of "as-applied challenge" that AstraZeneca brings now is

14

fundamentally different than the "facial challenge" at issue in *PhRMA*, and accordingly involves "distinct claims that require consideration of facts outside of the text of [the challenged law]." *Harris* Order at 10. Legal disputes must always be evaluated in light of "concrete factual developments." *Whole Woman's Health v. Hellerstedt*, 579 U.S. 582, 602 (2016), *abrogated on other grounds by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022). This is a "new case," *id.* at 599, that concerns a different statute, different legal claims, and different factual allegations than *PhRMA*— indeed, allegations that are *already* being proven correct through AstraZeneca's ongoing discovery.

## I.   HB 1473 IS PREEMPTED

The Supremacy Clause provides that the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof," are "the supreme Law of the Land ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. The Clause thus requires that "any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield.'" *Felder v. Casey*, 487 U.S. 131, 138 (1988) (quoting *Free v. Bland*, 369 U.S. 663, 666 (1962)).  As AstraZeneca's well-pleaded allegations make clear, HB 1473 impermissibly regulates the *price* of AstraZeneca's patented products, not their delivery. But *regardless* of whether the law is viewed as a regulation of pricing or delivery, its application to AstraZeneca's contract pharmacy policy directly interferes with— and thus is preempted by—AstraZeneca's federal patent rights. In addition, HB 1473's data-collection provision is also preempted by Section 340B, which relies for its enforcement on drug manufacturers being able to access covered entities' 340B sales data.

### A.   Federal Patent Law Preempts HB 1473

Congress has exclusive authority to establish incentives "[t]o promote the Progress of Science and useful Arts." U.S. Const. art. I, § 8, cl. 8. Under the federal patent system, inventors are "impelled to invest in creative effort" on the promise that they will obtain "a federally protected

15

'exclusive right'" to sell their inventions for a limited period. *Biotechnology Indus. Org. (BIO) v. District of Columbia*, 496 F.3d 1362, 1372 (Fed. Cir. 2007). States may not upset that finely calibrated system by seeking to regulate compensation for patented inventions: "Where it is clear how the patent laws strike that balance in a particular circumstance, that is not a judgment the States may second-guess." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 152 (1989).

State laws that cap the price at which patented drugs can be offered for sale are thus preempted by federal patent law because they "re-balance the statutory framework of rewards and incentives ... in effect diminishing the reward to patentees in order to provide greater benefit to ... drug consumers." *BIO*, 496 F.3d at 1374. The District of Columbia law at issue in *BIO* prohibited patented drugs from being sold "for an excessive price." *Id.* at 1365. The Federal Circuit explained that "[t]he underlying determination about the proper balance between innovators' profit and consumer access to medication ... is exclusively one for Congress to make," and that the D.C. law was "contrary to the goals established by Congress in the patent laws." *Id.* at 1374. The Federal Circuit accordingly found the D.C. law preempted by the federal patent laws. *Id.*

The same analysis applies to HB 1473. Like the District of Columbia law struck down in *BIO*, HB 1473 requires AstraZeneca to offer its patented drugs at discounted prices for a state-determined category of sales (contract pharmacy purchases). Whereas Section 340B itself requires manufacturers to offer discount pricing for a *limited* set of specifically enumerated transactions, HB 1473 forces AstraZeneca to offer discounted pricing to an *additional* category—unlimited contract pharmacy sales—for which federal courts have held that discounts are *not* required.

But even if HB 1473 could somehow be described as regulating distribution, that *still* would not change the result: The law still indisputably burdens AstraZeneca's ability to sell its

16

patented products. It thus impermissibly constrains AstraZeneca's "opportunity" to take advantage of the benefit of exclusivity conferred by Congress "during the patent's term." *BIO*, 496 F.3d at 1372. Yet States may not "re-balance" the "rewards and incentives" embodied in the federal patent laws, as North Dakota has done here. *Id.* at 1374.[1]

**1.** Defendants' argument against preemption begins with a fundamental confusion. Defendants mistakenly characterize AstraZeneca (at 2-3) as arguing that HB 1473 expands the category of covered entities in Section 340B to include contract pharmacies. That is not what AstraZeneca alleges or argues. Rather, it alleges—and will prove—that HB 1473 "require[es] AstraZeneca to offer discounts" on its patented products "for an entirely new category of sales: contract pharmacy sales." Am. Compl. ¶ 114. As one district court has explained, a law that requires discounts to be offered for a broader category of sales is a law that regulates pricing for that category:

> [I]magine if Congress passed a law requiring pizza parlors to sell pizzas at a 50% discount to anyone named John. If a state then passed a law requiring those pizza parlors to also deliver half-priced pies to any other person that John told them to, could that state law possibly be described as a mere "delivery" regulation? Of course not; the effect of the law is to reduce the price of pies that would otherwise be [delivered] to non-John's at full price. That's a law regulating pricing.

*AbbVie v. Drummond*, --- F. Supp. 3d ----, 2025 WL 3048929, at *5 (W.D. Okla. Oct. 31, 2025). That remains true even if the physical recipient of the discounted product (contract pharmacies) is nominally placing the order on behalf of someone else (a covered entity). "[T]he practical effect

---

[1] Amicus—but *not* Defendants—argues (at 2) that HB 1473 is not preempted because it does not "appl[y] only to patented drugs." But *BIO* is not limited to laws that apply only to patented drugs, and state laws are routinely preempted even when they regulate both patented and unpatented goods. *See, e.g.*, *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 231-32 (1964) (finding preempted a state unfair competition law that applied both to patented and unpatented goods); *Compco Corp. v. Day-Brite Lighting, Inc.*, 376 U.S. 234, 237 (1964) (similar). Indeed, *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 144 (1989), struck down a state law that applied *only* to "unpatented" products. Moreover, amicus's argument—that States may regulate the price of patented goods, so long as they *also* regulate the price of non-patented goods—would encourage States to enact *broader* restrictions in the hopes of evading patent-law preemption.

either way is that [the law] requires manufacturers to deliver drugs to contract pharmacies at a discounted price when they would otherwise be delivered at full price. And why? Because [the State] wants drug manufacturers to maximally subsidize [the State's] covered entities." *Id.*

Defendants' other main preemption defense (at 17-18) is that "H.B. 1473 does not purport to regulate the price of patent drugs," and instead "simply restricts manufacturers from placing conditions on delivery." But that purely semantic argument has no bearing on the "[p]re-emption analysis," which turns on "the actual content of [the law] and its real effect on federal rights." *Livadas v. Bradshaw*, 512 U.S. 107, 119 (1994). What matters is thus "how the regulation actually operates," not "how [the State] describes its regulation." *Drummond*, 2025 WL 3048929, at *5. As shown by both its text and AstraZeneca's well-pleaded factual allegations, HB 1473 regulates drug *pricing*—the prices that manufacturers may charge for contract pharmacy sales—not *delivery*.

Start with HB 1473's text, which identifies the drugs that it regulates *solely* in terms of their discounted price: The term "[d]rug" in HB 1473 just means a "drug purchased under reduced pricing under section 340B of the federal Public Health Service Act by a covered entity." HB 1473 § 1(a)(3). As a result, "[p]rice is what distinguishes between" a drug as defined by HB 1437 and "an 'ordinary drug.'" *PhRMA v. Morrisey*, 760 F. Supp. 3d 439, 455 (S.D. W.Va. 2024). The same is true as a factual matter: "There is no difference between AstraZeneca products that are offered under the 340B program and AstraZeneca products *not* offered under the 340B program, other than the price at which they are offered." Am. Compl. ¶ 53. HB 1473 then incorporates its price-based term ("drug purchased under reduced pricing") into its operative provision: Manufacturers must permit "the acquisition of a drug by a contract pharmacy on behalf of a covered entity." HB 1473 § 1(b)(1). The law thus ensures that contract pharmacies can "acqui[re]" "drugs" at 340B "reduced pricing." A manufacturer's *refusal* to offer discounted pricing, by contrast, is what

18

constitutes a violation of the law—and a crime. HB 1473 § 1(b). Simply put, a law that criminalizes charging too much is a law that regulates pricing. *See Morrisey*, 760 F. Supp. 3d at 456 ("manufacturer risks violating [the law] not by withholding drugs from contract pharmacies, but by refusing the 340B discount when delivering its drugs to those pharmacies.") (cleaned up).

AstraZeneca's factual allegations also demonstrate that HB 1473 regulates drug pricing. For one things, "AstraZeneca products" remain available for purchase in "unlimited quantities" by covered entities, by contract pharmacies, and by "[p]atients of covered entities" in North Dakota. Am. Compl. ¶ 57. AstraZeneca's policy also "does not prevent any pharmacy from receiving deliveries of, or otherwise acquiring, products manufactured by AstraZeneca," nor does it prevent "any covered entity from receiving or acquiring products manufactured by AstraZeneca." *Id.* ¶ 58. "Indeed, no covered entity [in North Dakota] has *ever* purchased an AstraZeneca drug at a 340B price for sales at a non-designated contract pharmacy but had AstraZeneca (or a wholesaler) refuse delivery of that drug." *Id.* ¶ 59 (emphasis added). So *delivery* is not at issue.

Instead, AstraZeneca's policy affects *pricing*—and only pricing. It means that covered entities are "unable to purchase ... drugs at 340B prices for sales at non-designated contract pharmacies." *Id.* ¶ 60. The policy thus "is a restriction on the circumstances under which [AstraZeneca] *offers* its products at 340B-discounted prices." *Id.* And HB 1473 forbids AstraZeneca's policy for precisely that reason: The policy prevents "the acquisition" of 340B-discounted drugs, HB 1473 § 1(b)(1), by rendering covered entities "unable to purchase drugs ... at 340B prices" for unlimited contract pharmacy sales, even though covered entities *can* purchase them "at *commercial* prices," Am. Compl. ¶ 60. So in actual effect—as shown through well-pled allegations—the law "isn't really regulating the delivery of drugs to those contract pharmacies, but rather the *price* at which those drugs must be sold." *Drummond*, 2025 WL 3048929, at *6.

19

Yet even if HB 1473 could be viewed as addressing acquisition and delivery in some nominal respect, that *still* would not change its character as a price regulation. "Pre-emption is not a matter of semantics," and North Dakota cannot avoid preemption "by resorting to creative statutory interpretation or description at odds with the statute's intended operation and effect." *Wos v. E.M.A. ex rel. Johnson*, 568 U.S. 627, 636 (2013). In *Engine Manufacturers Association v. South Coast Air Quality Management District*, for instance, federal law prohibited States from "adopt[ing] or attempt[ing] enforcement" of state standards for motor-vehicle emissions. 541 U.S. 246, 251 (2004). Yet California issued regulations "prohibit[ing] the purchase or lease" of noncompliant vehicles. *Id.* at 248-49, 253-54. The Supreme Court rejected that "meaningless" semantic argument: "treating sales restrictions and purchase restrictions differently for pre-emption purposes would make no sense." *Id.* at 255.

Similarly, putting aside Defendants' semantic arguments, HB 1473 does not merely govern the "delivery" of 340B-discounted drugs—any more than California law merely governed "sales." The law requires drugs to be offered at 340B-discounted prices, a mandate that—in substance, operation, and effect—functions as a price regulation. Here, there is no meaningful difference between a statute requiring the sale of goods to identified buyers at a specified price ("You must sell me a car for $1."), and a statute mandating delivery of the same goods at that same price to the same buyers ("You may not deny me delivery of a $1-priced car."). Either way, the statute's effect is to require manufactures to make *discounted pricing* available. Or as another court recently put it, given the way these laws operate, any "supposed distinction between 'delivery' and 'price' regulations" is wholly "artificial." *Drummond*, 2025 WL 3048929, at *5.

Factual allegations regarding the replenishment model make HB 1473's pricing effects even clearer. *See* Am. Compl. ¶¶ 33-37 (describing replenishment model). Under this model,

20

contract pharmacies "fill prescriptions from inventories that intermingle discounted and non-discounted drugs." *Novartis*, 102 F.4th at 457. The pharmacy dispenses these drugs to *any* patient, 340B-eligible or not. "Only after dispensing the drugs do these pharmacies attempt to discern whether individual customers were patients of covered entities—in other words, whether individual prescriptions were eligible for the discount." *Id.* After determining eligibility, "the pharmacy places an order" from the manufacturer at "the discounted [340B] price," which it uses to "replenish" its inventory (where 340B-priced and non-340B-priced drugs are again intermingled). *Id.* Thus, "[b]ecause the drug is already in the hands of the contract pharmacy even before the patient arrives at the pharmacy, the question is not about delivery of the drug." *Morrisey*, 760 F. Supp. 3d at 455. Instead, "[t]he question is only about what price the pharmacy and the covered entity will pay the manufacturer for the replenished drug upon distribution of the 340B Program eligible one." *Id.* The actual *distribution* (*i.e.*, movement) of 340B-priced drugs is no different from that of non-340B-priced drugs; and the *acquisition* of those drugs differs only in terms of their prices. *Id.* ("[T]he system is about delivery *at a given price*, not delivery *per se*.").

The increasingly prevalent "credit" replenishment model makes that conclusion—that HB 1473 affects only the *price* at which drugs are offered, not their *distribution*—clearer still. Under this model, the covered entity does not even purchase any new product, nor is any new product delivered. Am. Compl. ¶ 36. Instead, it engages in a "purely financial maneuver":

> Under this approach, the contract pharmacy's inventory is "virtually replenished" through a paper fiction—namely, by recharacterizing the prior transaction to make it appear as if the previously dispensed unit had been bought at the 340B price originally. To do so, the wholesaler simply credits the contract pharmacy for the commercial price; charges the 340B price to the covered entity; and then requests a refund from the manufacturer for the difference between the wholesale and 340B prices.

*Id.* In requiring manufacturers to pay "refund[s]" for such "virtual" transactions, *id.*, HB 1473 unmistakably regulates pricing, not delivery.

21

**2.** Defendants' responses fail to grapple with AstraZeneca's allegations regarding HB 1473's actual effects. Defendants assert without analysis (at 18) that HB 1473 "simply restricts manufacturers from placing conditions on delivery when contract pharmacies *act on behalf of* covered entities to dispense 340B drugs." That statement is irreconcilable with AstraZeneca's well-pled allegations, including its allegation that "no covered entity has ever purchased an AstraZeneca drug at a 340B price for sales at a non-designated contract pharmacy but had AstraZeneca (or a wholesaler) refuse delivery of that drug." Am. Compl. ¶ 59. It also ignores that AstraZeneca's policy merely restricts "the circumstances under which it *offers* its products at 340B-discounted prices," but "does not prevent covered entities from purchasing the same AstraZeneca products at *commercial* prices, including for sales at a non-designated contract pharmacy." *Id.* ¶ 60; *see id.* ¶ 58 ("AstraZeneca's policy does not prevent any pharmacy from receiving deliveries of, or otherwise acquiring, products manufactured by AstraZeneca.").

Defendants' argument further ignores the fact that HB 1473 does not regulate *any* actual feature of drug delivery. North Dakota *does have* laws that speak in generally applicable terms about the movement (delivery, distribution, and possession) of prescription drugs. *See, e.g.*, N.D. Cent. Code §§ 19-02.1-14.1, 19-02.1-15, 19-02.1-15.1, 19-02.1-16.4, 43-15-14, 43-15-32. But HB 1473, by contrast, says nothing about any genuine aspect of drug delivery. Instead, the law criminalizes conducting a transaction *at the wrong price*. Indeed, pricing is the *only* thing that distinguishes a sale that complies with HB 1473 from a sale that violates the law.

Defendants argue (at 17-18) that the 340B price is "federally determined." True, but HB 1473 requires the 340B price be offered for a *different* and far *broader* category of transactions— unlimited contract pharmacy sales—where "AstraZeneca would not otherwise offer" that price "and is not required to offer [it] under federal law." Am. Compl. ¶ 123. An analogy illustrates the

22

point. Imagine that a State required hospitals accepting Medicare patients to *also* provide care to all patients aged 55 or older at Medicare rates, even though Medicare begins at 65. The State might try to recharacterize its law as regulating the "delivery" of healthcare to specified patients. But that law would clearly be an impermissible effort to regulate the *price* of Medicare-participating hospitals by restricting what they are allowed to charge for non-Medicare transactions. The same is true here: HB 1473 requires manufacturers to offer their patented drugs at 340B prices in circumstances where such prices otherwise *would not be* required.

Defendants invoke (at 18) court decisions that held—with little analysis and *no* examination of facts—that other 340B laws were not preempted because they regulate delivery rather than price. But Defendants ignore *other* decisions that came in favor of manufacturers. And more important than the outcome of those cases is their persuasive reasoning: Unlike Defendants' cases, the decisions favoring manufacturers actually did grapple with well-pleaded allegations or evidence regarding how the challenged state laws function. *See Morrissey*, 760 F. Supp. 3d at 456 ("None of the non-binding authority that Defendants cite as examples of similarly upheld statutes indicates that the replenishment model was considered by those respective courts."). In cases where courts have performed "an examination of how the regulation actually operates," they have come out in manufacturers' favor. *Drummond*, 2025 WL 3048929, at \*5.

Defendants yet again invoke (at 24-25) the *PhRMA* decision. But that decision did not involve *any* of the claims or factual allegations at issue here. And the few "facts" that it *did* consider are wrong: The decision assumed that a contract pharmacy acts as "an agent of the covered entity" and that covered entities "maintain title to the 340B-discounted drugs." *PhRMA*, 95 F.4th at 1142, 1144. Those factual assumptions were foundational to the court's conclusion that, under the Arkansas law, "[p]harmacies do not purchase 340B drugs, and they do not receive the 340B price

23

discounts." *Id.* at 1144. But AstraZeneca has disputed both of those factual premises—and will disprove them through discovery—in this case. *See* Am. Compl. ¶¶ 80-81.

For similar reasons, the same Arkansas court that had been affirmed in *PhRMA* recently denied a motion for a judgment on the pleadings on AstraZeneca's patent-law preemption claim. *Harris* Order at 10-12. It rejected the State's argument that its law "does not cap or fix drug prices, only the federal 340B program does." *Id.* at 10-11. The court explained that "this case, unlike the prior case [*i.e.*, *PhRMA*], is before th[e] Court on a fully developed factual record." *Id.* at 12. Among other things, AstraZeneca was developing evidence to support its allegations "that covered entities do not actually retain title to the 340B drugs and that contract pharmacies are actually independent contractors, instead of agents of the covered entities, facts that AstraZeneca claims are different from what the Eighth Circuit based its ruling in the *PhRMA* Case on." *Id.* Thus, "taking [those] allegations as true," AstraZeneca had properly alleged "a right to relief." *Id.* So too here. Indeed, AstraZeneca's ongoing discovery is already proving its factual allegations correct.

**3**. In any event, HB 1473 is preempted by patent law *regardless* of whether it is framed as a regulation on price or delivery. Regardless of how it is charactered, HB 1473 has an undeniable *financial impact* on AstraZeneca's sale of its patented drug, which is all that is required for preemption purposes. As *BIO* explained, the federal patent laws reflect Congress's considered judgment regarding the "pecuniary rewards stemming from the patent right." 496 F.3d at 1372. States accordingly may not enact laws—however described—that "in effect diminish[] the reward to patentees [*i.e.*, to patent-holders] in order to provide greater benefit to [state] drug consumers," or that "limit[] the full exercise of the exclusionary power that derives from a patent." *Id.* at 1374.

Here, HB 1473 does just that. The law forces AstraZeneca to offer its patented products, like Farxiga, that "retail[] for hundreds of dollars commercially" in unlimited contract pharmacy

24

sales, where they "can be purchased for less than a dollar." Am. Compl. ¶ 51. As a result of that state-law obligation, AstraZeneca stands to lose "approximately $500,000 per month." *Id.* ¶ 95. The law thus "in effect diminish[es] the reward" from Farxiga and other patented products." *BIO*, 496 F.3d at 1374. And it does so "in order to provide greater benefit to [state] drug consumers"— in particular to North Dakota covered entities. *Id.* That runs directly counter to federal patent law.

**4.** Defendants invoke (at 17) a supposed "presumption" against preemption for state laws that concern "'matters related to health and safety.'" But no such presumption applies here.

*First*, the Supreme Court has explained that no presumption against preemption applies when a State attempts to regulate something "inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law." *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001). Such is true here: AstraZeneca's obligations towards 340B covered entities originate from Section 340B; are governed by Section 340B; and will terminate if AstraZeneca no longer participates in the 340B program. Indeed, HB 1473 *exclusively* regulates transactions involving 340B-priced drugs between manufacturers participating in the federal 340B program, 340B covered entities, and the pharmacies with which they contract. The provision thus directly targets, and is entirely parasitic on, federal law; if Section 340B were to be repealed, HB 1473 would cease to have any effect.

Nor can the presumption be justified on the ground that "the practice of pharmacy is an area traditionally left to state regulation." *PhRMA*, 95 F.4th at 1143. While state law has historically provided a "complementary form of drug regulation," including a "layer of consumer protection that complements [federal] regulation," *Wyeth v. Levine*, 555 U.S. 555, 578-79 (2009), those generally applicable state laws regulate the sale and distribution of *all* drugs, not just drugs sold within a federal program. HB 1473, by contrast, is not generally applicable: It applies if—but

25

*only* if—a manufacturer signs a PPA with the Secretary of the Department of Health and Human Services agreeing to abide by the 340B program's requirements, and HB 1473 attempts to dictate the treatment of 340B-priced drugs *solely* within that federal program.

**Second**, and independently, a presumption against preemption is also inapplicable here because there is no "historic presence of state law" in regulating drug *pricing*—much less in regulating the price at which 340B drugs in particular are offered for sale. *Wyeth*, 555 U.S. at 565 n.3. HB 1473 is thus qualitatively different from traditional state regulations designed to promote consumer health and safety. To the extent such a law could affect health or safety at all, it would do so only *incidentally*, as an attendant effect of keeping drug prices low.

As courts have held, however, drug pricing is *not* an area of traditional state regulation or police power. In *BIO*, the District of Columbia enacted a statute prohibiting the sale of certain drugs at "an excessive price." *BIO*, 496 F.3d at 1371 (quoting D.C. Code § 28-4553). When an organization of drug manufacturers challenged the law on preemption grounds, the District argued that the reviewing court should apply a "presumption that Congress has not intended to supplant [a] state law" that "addresses an area of traditional state regulation," particularly since "the state law at issue seeks to preserve the health and welfare of its citizens." Br. for Defs.-Appellants, *BIO*, 496 F.3d 1362, 2006 WL 3382103 (Oct. 30, 2006).

The Federal Circuit disagreed. The District's law was "targeted at the [federal] patent right"—that is, at federal laws setting "the proper balance between innovators' profit and consumer access to medication"—and thus the law fell within an area of traditional *federal* regulation, not state regulation. *BIO*, 496 F.3d at 1374. The same is true here: If HB 1473 is "targeted at" the ability of drug manufacturers to offer market prices for contract pharmacy sales, then no presumption against preemption applies. *See Morrisey*, 760 F. Supp. 3d, at 458-59 (distinguishing

cases finding no preemption of state 340B statutes).

To be sure, state law has historically provided a "complementary form of drug regulation," including a "layer of consumer protection that complements [federal] regulation." *Wyeth*, 555 U.S. at 578-79. But those generally applicable laws regulate the sale and distribution of *all* drugs, not just drugs sold within a federal program. HB 1473 is different. It targets sales of 340B-priced drugs (not all drugs) in transactions involving pharmacies that contract with 340B covered entities (not all providers). AstraZeneca is aware of no other context where a presumption against preemption was applied to a law that solely regulated the relationship between participants in a federal program—indeed, none where such a state regulation was even *attempted*.

**B.  Section 340B Preempts HB 1473's Data-Collection Provision**

The Supremacy Clause preempts any state law that "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000). HB 1473's claims-data does so, by forbidding a drug manufacturer from "[r]equir[ing] a covered entity or contract pharmacy to submit any claims, encounter, or utilization data as a condition for acquiring or receiving a drug, unless the claims, encounter, or utilization data sharing is required by federal law." HB 1473 § 1(b)(3). But AstraZeneca needs that data to satisfy its obligations under, and to participate fully in, the 340B program. In preventing AstraZeneca from exercising its right under federal law to obtain such data, HB 1473 interferes with—and thus is preempted by—Section 340B.[2]

The 340B statute prohibits covered entities from (i) collecting duplicate discounts from

---

[2] Defendants represent (at 26) that HB 1473 does not "prohibit[] participation in the Rebate Model Pilot Program," and that Defendants have "no intention of enforcing H.B. 1473's claims-data restriction to prohibit conditions that are required for a manufacturer's participation in the Rebate Model Pilot Program." In reliance on Defendants' representation, AstraZeneca does not pursue a preemption argument based on the Rebate Model Pilot Program.

both the 340B program and another federal program (duplicate discounting), or (ii) "resell[ing] or otherwise transfer[ring] [a 340B] drug to a person who is not a patient of the entity" (diversion). 42 U.S.C. § 256b(a)(5). To ensure compliance with these prohibitions on duplicate discounting and diversion, a covered entity must maintain auditable records of its 340B sales that are "sufficient to demonstrate continued compliance with 340B requirements." 75 Fed. Reg. 10272, 10,274 (Mar. 5, 2010). Section 340B also permit a manufacturer "to audit ... the records of the entity that directly pertain to the entity's compliance with the requirements described in" the anti-duplicate discount and anti-diversion provisions. 42 U.S.C. § 256b(a)(5)(C). *Before* a manufacturer may invoke its statutory audit rights, however, HRSA requires a manufacturer to establish "reasonable cause" that the entity is violating the 340B statute. 61 Fed. Reg. at 65,409. Without a showing of reasonable cause, HRSA will *not* authorize an audit—and a manufacturer is "effectively" unable to reasonable cause without getting claims data from the covered entity suspected to be in violation of Section 340B. Am. Compl. 73; *see id.* ¶ 72.

Compliance with HRSA's guidance, and hence use of Section 340B's program-integrity provisions, thus depend on the availability of claims data (*i.e.*, basic purchase information) from covered entities. As AstraZeneca explained, "[w]ithout access to claims data," it "lacks sufficient information to adequately identify and prevent . . . duplicate discounts," because "the information AstraZeneca needs to directly connect payer rebates to 340B dispenses is *not* otherwise available to AstraZeneca." Am. Compl. ¶ 71. In other words, AstraZeneca has no way to know whether a particular drug sale for which a 340B rebate was requested is the *same* transaction for which a Medicaid rebate or other rebate was *also* requested, *id.*, and so cannot prevent such double-dipping. Similarly, absent data about where its drugs are transferred and sold, manufacturers are unable to detect diversion. *See Drummond*, 2025 WL 3048929, at *7; *Morrisey*, 760 F. Supp. 3d at 453.

28

Importantly, drug manufacturers *do not* have access to that kind of data on their own, Am. Compl. ¶ 73, and their requests for covered entities "to provide the necessary information on a voluntary basis have been consistently spurned." *Id.* ¶ 71. Yet covered entities *already* collect and use such data in the regular course of business: The data is "already required of pharmacies when they submit claims to payers; and HRSA requires covered entities to maintain the same data in the regular course of business, with one minor exception for the unique identification number of the covered entity." *Id.* ¶ 74. Providing such information to AstraZeneca imposes only a "minimal" burden on covered entities. *Id.* ¶ 75 (quoting *Novartis*, 102 F.4th at 463). And notably, under federal law, "manufacturers *may* require 'standard information' from covered entities," including "claims data." *Novartis*, 102 F.4th at 463 (emphasis added).

HB 1473 directly cuts off a manufacturer's access to this data, thereby "frustrat[ing]" AstraZeneca's ability to exercise its statutory rights, including its audit rights. *N. Nat. Gas Co. v. Iowa Utils. Bd.*, 377 F.3d 817, 820 (8th Cir. 2004). And if a manufacturer cannot audit a covered entity, it cannot file an ADR claim—*i.e.*, a claim under the 340B program's dispute-resolution process. *See* 89 Fed. Reg. at 28,645; *see also* 42 U.S.C. § 256b(d)(3)(B)(iv). As one court aptly noted when striking down a similar law, "[b]y restricting the very method by which data collection is made," HB 1473 "frustrates drug manufacturers' ability to take the initial steps necessary to start the very audit required to access the alternative dispute resolution system." *Morrisey*, 760 F. Supp. 3d at 453; *see id.* (finding that a similar provision restricting audits unconstitutionally "stands as an obstacle to achieving the federal objective of preventing fraud in the 340B Program").

Defendants' responses yet again contravene AstraZeneca's well-pled allegations. Defendants argue (at 20, 22-23) that federal law does not require manufacturers "to submit 'claims, encounter, or utilization data" to "establish 'reasonable cause' for requesting an audit," and that

29

AstraZeneca does not need that data to request an audit as a practical matter. But AstraZeneca's well-pled allegations directly contradict that argument. *See, e.g.,*. Am. Compl. ¶¶ 69, 71, 87, 101. Defendants cannot prevail on the pleadings based on a disagreement with AstraZeneca about the *factual* predicates necessary to effectively use the audit process. *See Levitt*, 914 F.3d at 1171

Defendants also fail to explain how AstraZeneca can effectively police duplicate discounts and diversion without claims data. Defendants' argument simply "ignores the obvious: without suspicion-raising claims data, how would a manufacturer know to ever ask for an audit? The claims data, as far as the Court can tell, would be *the* way to detect possible diversion or double-dipping on discounts. The barrier to access that data created by [the law] thus stands in direct conflict with the 340B Program's dispute resolution mechanism." *Drummond*, 2025 WL 3048929, at *7.[3]

Defendants further argue (at 21) that the law does not "prevent drug manufacturers from *requesting* claims data," implying that AstraZeneca can rely on covered entities' *voluntary* disclosures. But "requests by manufacturers for participants in the system (including covered entities and contract pharmacies) to provide the necessary information on a voluntary basis have been consistently spurned." Am. Compl. ¶ 71; *see id.* ¶ 73. A purely voluntary scheme is thus one in which "the fox guards the hen house." *Morrisey*, 760 F. Supp. 3d at 453.

## II. HB 1473 VIOLATES THE CONTRACTS CLAUSE

Article I, Section 10 of the Constitution prohibits state laws "impairing the Obligation of Contracts." The Contracts Clause thus "restricts the power of States to disrupt contractual arrangements" with respect to "any kind of contract." *Sveen v. Melin*, 584 U.S. 811, 818 (2018). Courts assess Contracts Clause claims under a three-part test that balances the State's obligation

---

[3] Defendants also cite (at 23 n.5) "North Dakota-specific" measures that purport to "reduc[e] the risk of duplicative discounts." But those measures do not purport to (and cannot) eliminate the risk of duplicate discounts; nor do they address the problem of diversion—problems that Congress dealt with through the *federal* audit process, which HB 1473 impedes.

not to impair contracts with the State's interest in public welfare. *See Equip. Mfrs. Inst. v. Janklow*, 300 F.3d 842, 850 (8th Cir. 2002). First, the court asks "whether the state law has, in fact, operated as a substantial impairment on pre-existing contractual relationships." *Id.* Second, if the court finds substantial impairment, it must examine whether the State has a "significant and legitimate public purpose behind the regulation." *Id.* Third, if the State presents a legitimate justification for the impairment, the court "must determine whether the adjustment of the rights and responsibilities of contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption." *Id.* (cleaned up) (quoting *Energy Rsrvs. Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 412 (1983)).

HB 1473 fails every step of this test. It substantially impairs AstraZeneca's PPA with the federal government by imposing new, unanticipated, and unbargained-for obligations on AstraZeneca's decision to participate in the federal 340B program. And, especially on a Rule 12(c) motion, North Dakota cannot carry its "burden" of demonstrating that HB 1473 serves a significant and legitimate public purpose, or that it achieves any such purpose in an appropriately tailored manner. *Ass'n of Equip. Mfrs. v. Burgum*, 932 F.3d 727, 734 (8th Cir. 2019).

Indeed, Contracts Clause claims are rarely decided without discovery or a factual record. Many of the very cases that Defendants cite prove the point, as they dismissed Contract Clause claims only *after* factual development. *See Sveen*, 584 U.S. 811 (summary judgment); *Energy Rsrvs. Grp.*, 459 U.S. at 409 (summary judgment); *Assn. of Equip. Mfrs.*, 932 F.3d at 734 (affirming preliminary injunction); *Burlington N. R. Co. v. Nebraska*, 802 F.2d 994, 996-97 (8th Cir. 1986) (trial); *Minn. Ass'n of Health Care Facilities, Inc. v. Minn. Dep't of Pub. Welfare*, 742 F.2d 442, 444 (8th Cir. 1984) (trial); *PhRMA v. Murrill*, No. 6:23-cv-00997, 2024 WL 4361597, at *1 (W.D. La. Sept. 30, 2024) (summary judgment). Defendants' attempt to dispose of

AstraZeneca's claim on the pleadings should be rejected.

**1.** In determining "whether [a] state law has operated as a substantial impairment of a contractual relationship," courts consider "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Sveen*, 584 U.S. at 819 (citation and quotation marks omitted). HB 1473 does each of those things, and so impairs AstraZeneca's contractual rights.

The 340B program requires manufacturers to enter into contracts (PPAs) with the federal government. *See* 42 U.S.C. § 256b(a)(1). AstraZeneca signed its PPA "with the expectation and understanding that it would be required to offer discounts only for a limited category of sales, and it accepted that obligation in reliance on the federal government's careful balance of the costs and benefits of participating in the federal program." Am. Compl. ¶ 114. As the D.C. and Third Circuits recently underscored, neither the 340B statute nor the PPA (which incorporates the statute's requirements) obliges AstraZeneca to make 340B discounts available for sales "to an unlimited number of contract pharmacies." *Novartis*, 102 F.4th at 461 (quoting *Sanofi*, 58 F.4th at 703).

HB 1473 thus seeks to expand AstraZeneca's obligations under its PPA, by requiring AstraZeneca to allow "acquisition" of 340B-discounted drugs (*i.e.*, to offer 340B discounts) for a *different* category of transactions (unlimited contract pharmacy sales) that are *not* required by the PPA. Indeed, even if HB 1473 solely regulated delivery and not price, that would *still* impermissibly undermine AstraZeneca's existing bargain with the federal government: It is beyond dispute that HB 1473 imposes *under North Dakota law* a new obligation that did not exist (and does not exist) *under Federal law*. The law's effect is thus to bootstrap, onto AstraZeneca's contractual agreement with the federal government, new and un-contracted-for financial burdens.

The implications of those expanded burdens are similarly undeniable—and will become

32

even more undeniable after discovery. HB 1473 transfers revenue directly from manufacturers like AstraZeneca, and does so solely *because of* AstraZeneca's decision to sign a PPA. *See* Am. Compl. ¶¶ 106, 118. As discovery will confirm, HB 1473 annually imposes roughly six million dollars in new costs. *See id.* ¶ 95 ("$500,000 per month"). That new obligation constitutes a significant impairment of AstraZeneca's PPA. *See id.* ¶¶ 113-114. Non-signatories have no such obligations.

Defendants argue (at 29) that "none of AstraZeneca's vested rights and obligations under its PPA are disturbed ... because the 340B program ...  is silent about delivery to contract pharmacies." Even if it were true that HB 1473 regulates delivery rather than price, *but see*, pp. 19-20, *supra*, that would not matter under the Contracts Clause: What matters are the undisputable *financial effects* of HB 1473 on AstraZeneca's PPA. The decision in *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234 (1978), is instructive. There, the Court held that the Contracts Clause prohibited Minnesota from requiring a company to provide additional benefits not specified in a contract to provide pension benefits. *Id.* at 245-51. The law "change[d] the company's obligations"—imposing new obligations beyond the agreed-to contract—thereby "disrupti[ng] [its] contractual expectations" by "impos[ing] a completely unexpected liability in potentially disabling amounts." *Id.* at 246-47. The Court noted that the law "did not operate in an area already subject to state regulation at the time the company's contractual obligations were originally undertaken, but invaded an area never before subject to regulation by the State." *Id.* at 250.

HB 1473 alters AstraZeneca's expectations under the PPA in the same way. It forces AstraZeneca to offer 340B discounts for a significant category of transactions (unlimited contract pharmacy sales) that are *not* required to be offered under the program in which AstraZeneca agreed to participate. And the obligations imposed by HB 1473, like the statute struck down in *Allied Structural Steel*, were "imposed" by North Dakota only *after* AstraZeneca had signed its PPA,

33

upending AstraZeneca's reasonable and longstanding expectations. Am. Compl. ¶ 114.

Defendants point (at 30) to prior HRSA guidance as shaping AstraZeneca's expectations. But AstraZeneca's current policy is *consistent* with HRSA's 1996 Guidance. More fundamentally, HRSA's 2010 guidance authorizing unlimited contract pharmacy sales was *invalidated*—and therefore cannot serve as a basis for expectations. Am. Compl. ¶ 64 (citing *Sanofi*, 58 F.4th at 706). Defendants also offer nothing to counter AstraZeneca's factual representation that it "joined the 340B program with the expectation and understanding that it would be required to offer discounts only for a limited category of sales," which did *not* include "contract pharmacy sales." *Id.* ¶ 114.

Moreover, the reasonable-expectations inquiry is not whether drug sales are regulated *generally*, but "whether previous regulation was *in the area of the future regulation*." *Equip. Mfrs.*, 300 F.3d at 859 (emphasis added). Even in a "regulat[ed]" industry, it is the "extent and reach" of the particular regulation that matters. *Heights Apartments, LLC v. Walz*, 30 F.4th 720, 729-30 (8th Cir. 2022). And the burdens that AstraZeneca faces under HB 1473 arise in "an area never before subject to regulation by the State," *Allied Structural Steel*, 438 U.S. at 250—or, indeed, by *any* State: North Dakota adopted HB 1473 in 2021, decades *after* AstraZeneca joined the 340B program. It thus imposed new, burdensome state-law obligations on AstraZeneca, fundamentally altering the bargain that it struck with the federal government nearly thirty years earlier.

**2.** HB 1473's impairment of AstraZeneca's PPA does not serve "a significant and legitimate public purpose," much less does it serve such an interest in sufficently "appropriate" and "reasonable" way. *Equip. Mfrs. Inst.*, 300 F.3d at 850 (citation omitted). North Dakota "bears the burden of proof in showing a significant and legitimate public purpose underlying the Act," *id.* at 859, and "[a] state's recitation of an important public interest, alone, may not necessarily be sufficient to overcome the Contract Clause's limitation," *Heights Apartments*, 30 F.4th at 731.

34

Especially given the procedural posture, Defendants have failed to satisfy their burden here.

Defendants assert (at 31) that HB 1473 "is narrowly tailored to address the problem of drug manufacturers restricting access to 340B-discounted drugs through the common and accepted use of contract pharmacies." Yet any argument about "access" contravenes AstraZeneca's well-pled allegations, which makes clear that, under AstraZeneca's policy, "all covered entities and their patients [can] continue to access AstraZeneca's medicines at 340B prices." Am. Compl. ¶ 56. Indeed, "[c]ontract pharmacies … remain able to obtain unlimited quantities of AstraZeneca products," and "[p]atients of covered entities are [still] able to obtain unlimited amounts of AstraZeneca products *through* covered entities *and contract pharmacies*," *id.* ¶ 57 (emphasis added). Nor can HB 1473 be justified in terms of patient discounts, because the "huge profits generated by the 340B program" are *not* being "passed on to patients," *id.* ¶ 40.

Defendants' argument (at 31) based on covered entities' finances similarly fails to justify HB 1473. The Contracts Clause "prohibits special-interest redistributive laws, even if the legislation might have a conceivable or incidental public purpose." *Ass'n of Equip. Mfrs.*, 932 F.3d at 732. As a result, a law that "provid[es] a benefit to special interests" at the expense of a regulated party *does not* satisfy the constitutional requirement of "a legitimate public purpose." *Id.* at 733-34 (cleaned up). That is what HB 1473 does. As alleged, the law "will advance the economic interests of for-profit entities at the expense of companies like AstraZeneca." Am. Comp. ¶ 118. It enables covered entities to generate "substantial arbitrage revenues," *id.* ¶ 32; *see id.* ¶¶ 34, 36, 38; and also generates "up to $5 billion in annual profits from 340B sales" for contract pharmacies, *id.* ¶ 37; *see id.* ¶ 35 (20% of revenue captured by contract pharmacies). *All* of the money from this "multi-billion-dollar arbitrage scheme" comes directly from drug manufacturers like AstraZeneca. *Id.* ¶ 42; *see id.* ¶ 95. Where, as here, a challenged law "primarily benefits ... particular economic

actor[s]" at the expense of others, *Ass'n of Equip. Mfrs.*, 932 F.2d at 733, "such special interest legislation runs afoul of the Contract Clause," *Equip. Mfrs. Inst.*, 300 F.3d at 861.

### III.    HB 1473 VIOLATES THE TAKINGS CLAUSE

The Takings Clause of the U.S. Constitution, which applies to the States through the Fourteenth Amendment, forbids the government from taking "private property ... for public use, without just compensation." U.S. Const. amend. V. The Clause is "indispensable to the promotion of individual freedom," as "property must be secured, or liberty cannot exist." *Cedar Point Nursery v. Hasid*, 594 U.S. 139, 147 (2021) (cleaned up). It stops the "Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960).

Under the Takings Clause, the government may take private property "for public use," though only so long as it pays "just compensation." But the government may *never* take private property for *private* use. As the Supreme Court has explained, "the sovereign may not take the property of *A* for the sole purpose of transferring it to another private party *B*," a prohibition that applies regardless of whether "*A* is paid just compensation." *Kelo v. City of New London*, 545 U.S. 469, 477 (2005). Such takings for private use are *always* unlawful: "No amount of compensation can authorize such action." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 543 (2005).

**A.** HB 1473 forces AstraZeneca to transfer its property to other private entities, in violation of the federal and state Takings Clauses. A taking occurs whenever "the government physically acquires private property," or if it provides for the physical appropriation of private property by "a third party." *Cedar Point Nursery*, 594 U.S. at 147-48. Such a physical appropriation transpires whenever the government orders a manufacturer to "set aside" some of its product to be sold to private parties at non-market prices that are "determine[d]" by the government. *Horne v. Dep't of Agric.*, 576 U.S. 350, 354, 362 (2015). HB 1473 *expressly* does just that, forcing manufacturers to

36

offer their drugs at below-market prices to other private (non-governmental) entities—namely to covered entities (and the contract pharmacies they contract with). *See* HB 1473 § 1(b)(1) (manufacturer may not prevent "acquisition" of its 340B-priced drugs "by a contract pharmacy").

This is a physical appropriation. As AstraZeneca has alleged, and as evidence will show, "[o]nce the 340B-priced offer compelled by HB 1473 has been accepted by a covered entity, AstraZeneca has no choice under the law but to relinquish custody, title, and control of its product." Am. Compl. ¶ 123. Such a forced transfer of property is a "classical taking," *United States v. Sec. Indus. Bank*, 459 U.S. 70, 78 (1982), because the law forces AstraZeneca to "physically set aside" a portion of its property and make it available for acquisition at a price selected by the government, *Horne*, 576 U.S. at 354, 361-62. In being forced to relinquish title to its drugs, AstraZeneca must give up the "entire 'bundle' of property rights in the appropriated" products. *Id.* at 361. As the Supreme Court has explained, laws with such an effect work "a clear physical taking." *Id.*

This forced transfer would be unlawful even if manufacturers were paid just compensation. *See Lingle*, 544 U.S. at 543. But in fact, AstraZeneca is *not* being justly compensated for the forced transfers required by HB 1473: They occur at steeply discounted prices, well below fair market value. Under the law, AstraZeneca must offer—and if the offer is accepted, must relinquish control over—products like Farxiga that "retail[] for hundreds of dollars commercially" for a price of "less than a dollar." Am. Compl. ¶ 51. North Dakota does *not* compensate AstraZeneca for that price difference. Thus, as one court explained, a manufacturer "adequately allege[s] a per se taking claim" by alleging, as AstraZeneca does here, that the State's contract-pharmacy law "mandat[es] the physical transfer of personal property—the 340B drugs—to another private property without just compensation." *AbbVie, Inc. v. Brown*, --- F. Supp. 3d ----, 2025 WL 3228898, at *11 (D. Utah Nov. 19, 2025). Again, the financial impact of this forced transfer is undeniable. Am. Compl. ¶ 95.

37

**B.** Defendants respond (at 33-34) that AstraZeneca participates in the 340B program "voluntarily." But AstraZeneca's acceptance of the terms of a *federal* program does not constitute voluntary agreement to *North Dakota's* additional (and unconstitutional) demands. None of Defendants' cases (at 33-34) grapple with that key distinction—nor do Defendants themselves.

It is true that, under certain circumstances, voluntarily accepting a governmental benefit "in exchange for" giving up property rights can extinguish a takings claim against the government that conferred the benefit. *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1007 (1984). The voluntary-participation doctrine thus may protect the *federal* 340B statute from running afoul of the Takings Clause. For instance, had Congress simply commanded manufacturers to transfer their property to covered entities, without granting anything in return, that plainly would have been unconstitutional. *See Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 831 (1987). Instead, Congress expressly conditioned manufacturers' access to federal Medicare and Medicaid benefits on compliance with the requirements of Section 340B. *See* 42 U.S.C. § 256b(a); *id.* § 1396r–8(a)(1). That bargain—access to federal programs in exchange for property—is the *only* reason Congress was allowed to force manufacturers to offer their drugs to private parties at below-market prices.

HB 1473, however, "cannot reasonably be characterized as part of a ... voluntary exchange." *Horne*, 576 U.S. at 366. AstraZeneca's voluntary bargain is with the federal government; *the State* confers "no additional benefit" on AstraZeneca in exchange for compliance with HB 1473—indeed, it confers "no benefit at all." *Valancourt Books, LLC v. Garland*, 82 F.4th 1222, 1232-33 (D.C. Cir. 2023); *see Brown*, 2025 WL 3228898, at *12 ("AbbVie does not voluntarily accede to the wider parameters of SB 69 in exchange for some benefit.").

*Valancourt Books* is instructive. At issue there was a Takings challenge to a provision of the federal Copyright Act requiring the owner of a copyright in a work to "deposit two copies of

38

the work with the Library of Congress within three months of its publication." 82 F.4th at 1226. The plaintiff (Valancourt Books) was an independent publisher. *Id.* at 1228. The Copyright Office demanded that Valancourt provide copies of certain books it had published, or else pay a fine of up to $250 per book, plus $2,500 for willful refusal to comply. *Id.* Valancourt sought a declaration that the statute violated the Takings Clause. The D.C. Circuit agreed. "A physical appropriation of property presents the 'clearest sort of taking,'" triggering a "'simple, *per se* rule: The government must pay for what it takes.'" *Id.* at 1231 (quoting *Cedar Point Nursery*, 594 U.S. at 148). The provision at issue, which amounted to "[a] government demand to turn over personal property," therefore constituted a physical appropriation that required *per se* treatment. *Id.*

To defend the challenged law, the government argued that the requirement to deposit copies in return for copyright protection was merely "a voluntary exchange for a governmental benefit." *Id.* at 1232. But those benefits of copyright protection existed independently of the mandatory-deposit provision, the Court explained, such that the "mandatory deposit [requirement] grants no *additional* benefits." *Id.* at 1233 (emphasis added). The lack of any "incremental benefit that copyright owners receive for depositing [their] works" meant that the requirement "cannot represent a voluntary exchange for a benefit—there is no benefit at all." *Id.*

The same is true here: HB 1473 confers "no benefit at all" to manufacturers, and so "cannot represent a voluntary exchange for a benefit." *Id.* Indeed, this result follows *a fortiori* from *Valancourt Books*. There, the federal government had at least given publishers a benefit (copyright protection), even if the benefit was not tied to the mandatory deposit requirement. Here, North Dakota has given manufacturers *no* benefit whatsoever. As one court put it, "Defendants may not broaden the bargain by riding the coattails of a federal benefit." *Brown*, 2025 WL 3228898, at *12. Or as another explained, "[t]here is no exchange of value because [the State] isn't giving the drug

39

manufacturers anything they don't already have (i.e., access to the federal market) as compensation for forcing them to make discounted sales," but instead is simply "raising the cost of exercising a 'basic and familiar use of [the manufacturer's] property'—its sale, while offering nothing in return." *Drummond*, 2025 WL 3048929, at *8 (quoting *Horne*, 576 U.S. at 366) (cleaned up).

Defendants' argument (at 32-33) that HB 1473 "does not affect any property interest that is cognizable under the Fifth Amendment" is equally unavailing. That contention is based on the same confused premise underlying many other arguments raised in Defendants' brief: the mistaken impression that AstraZeneca is arguing that HB 1473 "alter[s]" or "expand[s]" the "definition of a covered entity" to include contract pharmacies. That is not what AstraZeneca alleges. Rather, HB 1473 effects a taking by compelling AstraZeneca to offer—and thus to relinquish title, possession, and control over—its property at discounted prices for unlimited contract pharmacy sales. Am. Compl. ¶ 86. But for HB 1473, AstraZeneca would *not* be required to make those sales. Regardless of whether the statute "alter[s]" or "expand[s]" the definition of "covered entity," it indisputably alters the category of *transactions* in which below-market-prices must be offered.

Finally, Defendants' contention (at 32) that HB 1473 does not "*force*[] manufacturers to sell 340B-discounted drugs to commercial pharmacies" is belied by the law's plain text. HB 1473 bars AstraZeneca from "interfer[ing] with the acquisition of a drug . . . by a contract pharmacy" at 340B-discounted prices. HB 1473 § 1(b)(1). If a statute forbids a homeowner from "interfering with the acquisition" of his or her home for $1 by interested homebuyers, the statute would "clearly" be forcing the home's sale for $1. *Horne*, 576 U.S. at 362. The same is true for HB 1473.[4]

## CONCLUSION

The motion for judgment on the pleadings should be denied.

---

[4] Defendants attack (at 35-37) a regulatory-taking argument that AstraZeneca did not bring.

Dated: December 23, 2025             Respectfully submitted,

                                     */s/ Joel Fremstad*
                                     Joel Fremstad (ND ID 05541)
                                     FREMSTAD LAW FIRM
                                     P.O. Box 3143
                                     Fargo, North Dakota 58108-3143
                                     Phone: (701) 478-7620
                                     joel@fremstadlaw.com

                                     AND

                                     Allon Kedem*
                                     Jeffrey L. Handwerker*
                                     Samuel I. Ferenc*
                                     Arnold & Porter Kaye Scholer LLP
                                     601 Massachusetts Ave., NW
                                     Washington, DC 20001-3743
                                     (202) 942-5000 telephone
                                     (202) 942-5999 facsimile
                                     allon.kedem@arnoldporter.com
                                     jeffrey.handwerker@arnoldporter.com
                                     sam.ferenc@arnoldporter.com

                                     Carmela T. Romeo*
                                     ARNOLD & PORTER KAYE SCHOLER LLP
                                     250 West 55th Street
                                     New York, NY 10019-9710
                                     (212) 836-8000
                                     (212) 836-8689 fax
                                     carmela.romeo@arnoldporter.com

                                     * *Admitted pro hac vice*

                                     *Attorneys for Plaintiff AstraZeneca Pharmaceuticals LP*